THOMPSON, J.
 

 In March, 1923, the Otis Manufacturing Company of New Orleans and the Munson Steamship Line of the city of New York entered into a written contract of affreightment, otherwise called a charter party, whereby the steamship line agreed to transport from certain ports on the Central American Coast, and from the Atlantic Coast of Nicaragua to the Otis Manufacturing plant at New Orleans approximately 45,000 tons of mahogany, and/or cedar logs.
 

 It was stipulated that approximately 10,-000 tons were to be shipped from Frontera or Santana, 10,000 tons from the Belize range, and 25,000 tons from the Nicaraguan Coast.
 

 There was to be a freight charge of $4 per ton on the logs moved from Frontera or Santana, $3.75 per ton on the logs moved from Belize range, and $5.50 per ton on the logs moved from Nicaraguan Coast.
 

 There was to be a charge against the shipper of $225 per day for every day’s detention of the movement of the cargo by default of the said shipper. The term of the contract was to run from July 1,1923, to January 31, 1924, but the shipper had the right to require one steamer during the month of May or June, 1923, on the same terms as fixed in the contract.
 

 The contract stipulated a commission of
 
 2y2
 
 per cent, on the amount of the charter, renewals or .duplications and demurrage, to be paid by the vessel or owner to' Arthur H. Page Company, Limited (now Page L’Hote Company, Limited) and Potter Trapsportation Company.
 

 It is admitted that the commission stipulated was paid to the two steamship brokers during the life of the contract.
 

 On January 30, 1924, the steamship Company and the Otis Manufacturing Company entered into a second contract covering the period from February 1, 1924, to January 31, 1925.
 

 And on December 9, 1924/ the same parties entered into a third contract running from February 1, 1925, to January 31, 1926. On March 15, 1926, the same parties entered into a fourth contract for the period from March 15, 1926, to March 15, 1927.
 

 The last three contracts called for the transportation of 35,000 tons of logs during each contractual term, and it is admitted that the shipper paid over to the steamship line as freight under the three contracts the sum of $373,985.19.
 

 It is upon the amount received by the steamship line under the three contracts mentioned that the plaintiff claims a commission of 1% per cent.
 

 It appears bo be conceded that the contracts on which the commission is claimed were negotiated and consummated by the contracting parties without the intervention of the brokers named in the first contract or that of any other broker or agent.
 

 We do not understand, therefore, that the plaintiff’s claim is based on any service rendered in connection with the last three contracts, or on any special agreement as to a commission for those particular contracts.
 

 The contract for 1923, on which the plaintiff and its New York associate were paid a commission of 2% per cent., contains the following stipulation:
 

 
 *727
 
 “A commission of 2% per cent, on the amount of this charter, renewals or duplications and demurrage payable by vessel and, or, owners is due on signing of this Charter Party, ship lost or not, charter cancelled or uncancelled, to Arthur H. Page Company Ltd. and Potter Transportation Co.”
 

 . It is upon this stipulation that the plaintiff bases its claim for a commission; the theory being that the words “renewals” and “duplica!ions” include any and all future contracts of affreightment between the same parties for the transportation of like character of logs from any of the foreign ports named to the shipper at New Orleans.
 

 We are . unable to agree with plaintiff in that interpretation of the contract.
 

 Such a construction in our opinion is opposed to the plain language of the contract, and was obviously never contemplated by the parties at the time the contract was made.
 

 It will be observed that in the very beginning of the contract it was stipulated that the steamship line was to furnish all tonnage the shippers may require to move all of the mahogany and/or cedar logs that shippers will have as stipulated further on in the contract, during the term of the contract.
 

 While the tonnage was fixed at approximately 45,000 tons, the' shipper (Otis Manufacturing Company) had the option of furnishing larger cargo, provided this option was declared at the time the requisition of a steamer was made, and the owners (steamship line) were to have the privilege of supplying one or two steamers to move the quantity stipulated for, and, should any small quantity be left over by the steamer, the same was to be held until the next vessel is called for, except the last cargo to be moved when the owners agreed to move the entire quantity the shippers would require.
 

 It was further agreed that the shippers should notify the carriers of the tonnage requirements at least ten days in advance of the loading date. It was further stipulated that steamers should accept on each voyage logs up to five tons, provided that the shipper had the option of shipping logs in excess of five tons, if agreeable to the master of the vessel.
 

 It may be argued that the provisions we have mentioned refer to particular cargoes, and not to an increase of the total tonnage as stipulated.
 

 But, when the contract is carefully considered and' analyzed as a whole, we think it clear that, although the amount of logs was fixed at approximately 45,000 tons, the shipper had the option of increasing that tonnage according to shipper’s requirements on' giving seasonable notice, the excess requisition not to be beyond the transportation facilities of the steamship line; in other words, the contract did not limit the amount of the logs to be transported to exactly 45,000 tons.
 

 That being true, the brokers would have been entitled to their commission on any excess requirements above the tonnage stipulated, and this, we think, is precisely what was meant by the use of the words “renewals” and “duplications.”
 

 The contract was a special contract to be executed during a fixed period of time, and any freight charges earned during that time under that contract were subject to the brokers’ commission.
 

 The provision of the contract we have quoted expressly limits the commission to that contract or charter and to renewals or duplications of that contract, made, of course, during the period fixed in that contract. Any construction which would extend the terms used to any future contract made by the parties after the expiration of the term fixed by that contract would be unreasonable, and manifestly not within the contemplation of the parties.
 

 
 *729
 
 The brokers prepared the contract, and signed the same with the Otis Manufacturing Company, and, if it had been the intention to provide for a commission on any other and future contract the parties made themselves, it' seems that language could have been employed which would clearly have expressed •such intent.
 

 If commissions are due under the three contracts, then such commissions will be due on ■any contract of that character hereafter made between the parties, regardless of the length of time such contractual relations may be renewed and continued.
 

 The authorities cited by counsel for plaintiff have no application whatever to the instant case.
 

 In Jenkins v. Trott, 3 La. Ann. 671, the master of a vessel had employed a broker to procure a freight. The broker introduced to the master a party having merchandise to ship. The master declined to take the merchandise on the terms offered; but a few days after, while the broker was still employed to procure a freight for the master on better terms, concluded through another broker a bargain with the same party and on the terms first proposed, and paid the second broker a commission. The court held, and properly so, that, to allow the master of the vessel to defeat the broker’s claim by taking the identical offer through another broker would enable him to commit a fraud upon the first broker employed.
 

 The cases of Wilkinson v. Martin, 8 Car. & P. 1, and Burnett v. Bonch, 9 Car. & P. 620, are cited in the Jenkins Case, and support the ruling in that case.
 

 In Sturgis v. New Jersey Steamboat Co., 62 N. Y. 625, the president of the defendant company had agreed with Sturgis that, if he would effect a charter for the steamers, he would be paid 5 per cent, on the earnings.
 

 Sturgis saw the government agent, and took him to the president of defendant company. An agreement was entered into for two vessels at $800 per day. Charter parties were executed hiring the vessels for one month and as much longer as said vessels may be required by the United States War Department. The steamers remained in the service of the government, one for 239, and the other 210, days. It was admitted that the defendant received the charter money.
 

 The defendant contended that the commission should be limited to one month’s earnings, but the court held that plaintiff was entitled to the commissions on the whole earnings.
 

 There was but one contract, and that was a continuing contract so long as the vessels were required by the War Department. There was no reason in law or morals for splitting up the time of the contract and allowing commissions on only what was earned under the contract for the first 30 days.
 

 In White v. Baxter, cited from English and Empire Digest, vol. 1, page 503, a ship broker was employed by ship builders to introduce business to them.
 

 The broker succeeded in finding a purchaser for two ships, and received a commission. A few months later the ship builders sold a third ship to the same purchaser, without the broker’s intervention. It appeared that, by usage of the trade, ship brokers were entitled to commission on future sales resulting from the introduction, if effected within a reasonable time. For this reason the court held that the jury was justified in finding that the parties contemplated that the introduction would produce business in the sale of more than one ship. In the instant case the plaintiff relies on a special contract and not on usage of trade.
 

 And, moreover, in the cited case, the broker was employed “to introduce business” to the ship builders, whereas in the instant ease the
 
 *731
 
 brokers were only employed to negotiate a single contract.
 

 In the ease of Allen v. Sundins, 158 English Report's (Exchequer) 827, the commission on a renewed charter was allowed because of a custom among shipbrokers that an “introducing” broker was entitled to receive renewed commissions on every renewal of a charter originally effected through him. The ruling is manifestly not pertinent to the instant case.
 

 The citation from 32 C. J. 1078, is to the effect that an insurance agent is entitled to a commission on renewal premiums of insurance where his contract provides for such commission, but he is not entitled to such commission if his contract does not provide for same.
 

 We fail to see wherein that citation can have any pertinent bearing on this case.
 

 The same author, volume 9, p. 519 says, that the agency of a broker whose employment is definitely limited by his contract terminates with the expiration of the time specified, unless, by virtue of the contract, the agency continues thereafter until revoked.
 

 Our conclusion is that the three contracts on which commissions are claimed cannot in any sense be construed or held to be renewals or duplications of the first or initial contract.
 

 The judgment appealed from is therefore affirmed.